**ADMINISTRATIVE LAW**

RULEMAKING — HEALTH — DEVELOPMENTAL DISABILITIES —
    ELIGIBILITY CRITERION IN MEMORANDUM OF
    UNDERSTANDING, WHICH WAS NOT ADOPTED AS A
    REGULATION, IS INVALID


November 8, 1993


*The Honorable Kenneth H. Masters*
*The Honorable Virginia M. Thomas*
*House of Delegates*

You have each requested our opinion on issues involving the "Memorandum of Understanding to Provide Services for Transitioning Students Requiring Supported Employment Services" ("MOU"), which has been entered into by the Divisions of Special Education and of Rehabilitation Services within the Maryland State Department of Education, the Developmental Disabilities Administration within the Department of Health and Mental Hygiene, and the Division of Employment and Training within the Department of Economic and Employment Development.[1]

Specifically, you have asked whether this MOU falls within the definition of a "regulation" and, therefore, is subject to the adoption process set out in the Administrative Procedure Act; and whether one of the eligibility criteria set forth in the MOU, which conditions eligibility on an individual's having a job, is legally objectionable because it is inconsistent with an existing regulation.

For the reasons stated below, we conclude that the eligibility provisions of the MOU are a "regulation," as defined in the APA, and therefore are not enforceable unless properly adopted. We further conclude that the job-requirement criterion in the MOU is inconsistent with an existing regulation, COMAR 10.22.10. Given that the criteria set forth in COMAR 10.22.18 have been properly

---

[1] The MOU was revised in August 1992 and is currently again under revision in order to incorporate the 1992 amendments to the federal Rehabilitation Act.

adopted through the APA process, these criteria − and not those in the MOU − apply to supported employment services provided through the Developmental Disabilities Administration.[2]

# I

## Background

In 1989 "The Governor's Initiative for Transitioning Youth" was implemented as a cooperative effort between the State Department of Education, the Department of Health and Mental Hygiene, and the Department of Economic and Employment Development. The goal of the initiative was to coordinate the State's programs and services to students with developmental disabilities who were transitioning out of local school systems at age 21 and who would likely require supported employment services in order to maintain employment during the course of their working lives.

Several broad concepts underlie the goals of the MOU at issue. The goal of supported employment is to provide the supportive services necessary to enable an individual with developmental disabilities to participate in a job that allows the individual to work side-by-side with his or her non-disabled peers. *See* M. A. Moon, *et al., Helping Persons With Severe Mental Retardation Get and Keep Employment* (1990).

Prior to the implementation of supported employment, individuals with severe disabilities would typically move from a school program, where they had been segregated from their non-disabled peers, to an adult service provider, where they would attend an activity center or sheltered workshop at which the focus of their

---

[2] In light of these conclusions, we have no occasion in this opinion to consider other legal questions that might arise about the job-requirement criterion. Because the agencies will need to reevaluate the eligibility criteria in the MOU, and because the applicability of such federal laws as the Rehabilitation Act and the Americans with Disabilities Act depends on the particulars of the proposal, we believe it best to defer an analysis of these often difficult legal issues until the agencies decide whether to proceed with a regulation that embodies the job-requirement criterion.

activities would be the attainment of "job readiness" skills. Only when, or if, they attained such "job readiness" did they move into a community work setting. R. Chesek, *The Governor's Initiative for Transitioning Youth: An Evaluation of Maryland's School to Work Transition System* at 1 (1993). Supported employment presumes that a disabled individual is capable of work and should be given the opportunity to participate in a job that allows the individual to work in a competitive work setting. *Id*. at 2. "By incorporating a 'place and train' model of vocational training, the student/consumer with a disability does not have to work towards community employment, but is trained in real work settings from the outset." *Id*. (citation omitted).

## II

### Legal Authority

Supported employment, as a federally funded program, is set out in the Vocational Rehabilitation Act, 29 U.S.C. §706 *et seq.* The 1992 amendments to that Act define "supported employment" as:

> [C]ompetitive work in integrated work settings for individuals with the most severe disabilities −
>
> (i)    (I) for whom competitive employment has not traditionally occurred; or
>
>         (II) for whom competitive employment has been interrupted or intermittent as a result of a severe disability; and
>
> (ii) who, because of the nature and severity of their disability, need intensive supported employment services or extended services in order to perform such work.

29 U.S.C.A. §706(18)(A). The term "includes transitional employment for persons who are individuals with the most severe disabilities due to mental illness." 29 U.S.C. §706(18)(B).

The term "supported employment services" is defined in part as "ongoing support services and other appropriate services needed to support and maintain an individual with the most severe disability in supported employment ...." 29 U.S.C. §706(34). Under the federal law, individuals are eligible for supported employment services if:

>    (1)  the individual is eligible for vocational rehabilitation services;

>    (2)  the individual is determined to be an individual with the most severe disabilities; and

>    (3)  a comprehensive assessment of rehabilitation needs of the individual ... including an evaluation of rehabilitation, career, and job needs, identifies supported employment as the appropriate rehabilitation objective for the individual.

29 U.S.C. §795m.[3]

The Division of Rehabilitation Services ("DORS"), a division of the State Department of Education, is the State agency that receives federal funding to provide time-limited supportive employment services under the Vocational Rehabilitation Act. Individuals receiving services through DORS include individuals with developmental disabilities. Eligibility requirements for these federally funded services conform to federal law and are not at issue.

In addition to these federally funded services, the Developmental Disabilities Administration ("DDA"), using State general funds, provides follow-up supportive employment services to individuals with developmental disabilities. COMAR 10.22.18, "Eligibility for and Access to Community Services for Individuals with Developmental Disability," is relevant to the State-funded supported employment services. These regulations, which establish the eligibility criteria for receipt of services provided though the

---

[3] The regulations implementing this Act are found at 34 C.F.R. Part 363.

DDA, establish priority groups and the order in which these groups receive services.

Specifically, COMAR 10.22.18.07B(4) creates a category of individuals referred to as "Transitioning Youth." To qualify for DDA funding for services in this category, an applicant must be between the ages of 21 and 22 and have graduated from school. Eligibility continues for one year. The applicant must meet the definition of an individual with a developmental disability. The regulation contains no requirement that the individual must leave school with a job.

## III

### The Memorandum of Understanding

The MOU at issue sets forth the eligibility criteria that an individual must meet to receive supported employment services, the referral procedures that begin the process for obtaining these services, and the responsibilities of each of the State agencies involved in the "Initiative." As to the eligibility criteria, the MOU provides in pertinent part as follows:

> To be eligible for services under this Memorandum of Understanding, students must be determined eligible by DDA as a transitioning student and also be determined eligible by [DORS] for supported employment services.

The Developmental Disabilities Administration is called on to make the following eligibility determinations:

> 1. The student has a severe chronic disability that:
>
> a. Is attributable to a physical or mental impairment, other than the sole diagnosis of mental illness, or to a combination of mental and physical impairments;

       b.           Is manifested before the individual attains the age of 22;

       c. Is likely to continue indefinitely;

       d.          Results in an inability to live independently without external support or continuing and regular assistance.

       e. Reflects the need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services that are individually planned and coordinated for the individual; *and*

     2.   The student:

       a. Will be at least 21 years of age at the completion of their [*sic*] school program;

       b.          *Will leave school with a supportive employment job;*

       c. Agrees to participate in any funding initiatives proposed by DDA as a condition of funding, *e.g.*, Social Security Work incentives.

The definitional criteria in Paragraph 1 of the MOU simply reflect the definition of "developmental disability" set forth in §7-101(e) of the Health-General Article, Maryland Code. They pose no issue. Criterion 2(b), emphasized above, is the focus of your opinion request.[4]

---

[4] The other portions of the MOU involve the referral process, which is based on the eligibility criteria, and the responsibilities of the State agencies involved in the Initiative. We do not understand these sections of the MOU to be at issue. These portions of the MOU are outside the definition of a "regulation" and therefore remain effective in their present form – that is, as part of the MOU. *See* note 7 below.

**IV**

**Applicability of Rulemaking Requirements**

*A.    Rulemaking Requirements Generally*

The Administrative Procedure Act, which under §10-102(a) of the State Government Article ("SG" Article) applies to virtually every unit in the Executive Branch, prescribes the procedural requirements for the adoption of a regulation.[5]  If an agency's action is a "regulation," as that term is defined in the APA, "the action may be taken only in accordance with the rulemaking procedures contained in the [APA]." *CBS, Inc. v. Comptroller*, 319 Md. 687, 692, 575 A.2d 324 (1990).  *See also, e.g.,* 76 *Opinions of the Attorney General* 19, 22 (1991); 68 *Opinions of the Attorney General* 9, 11 (1983); 65 *Opinions of the Attorney General* 396, 404 (1980).

If an agency takes an action subject to the APA's rulemaking process but fails to comply with these procedural requirements, the agency's action is unenforceable.  SG §10-125(d)(3).  *See, e.g.*, 76 *Opinions of the Attorney General* 3 (1991)(statement by Physical Therapy Board about scope of practice of physical therapy of no legal effect because it had not been adopted in accordance with the APA); 57 *Opinions of the Attorney General* 478, 479-80 (1972) (eligibility requirement for welfare program invalid and unenforceable because it had not been adopted in accordance with the APA).

*B.    Definition of "Regulation"*

The APA defines the term "regulation" quite broadly:

> (1)    'Regulation' means a statement or an amendment or repeal of a statement that:

> > (i)   has general application;

---

[5] For a detailed review of the history, purpose, and requirements of the "regulation" component of the Administrative Procedure Act, *see* 75 *Opinions of the Attorney General* 37 (1990).

(ii)  has future effect;

(iii)            is adopted by a unit to:

1.  detail or carry out a law that the unit administers;

2.  govern organization of the unit;

3. govern the procedure of the unit;

4. govern practice before the unit; and

(iv) is in any form, including:

1. a guideline;

2. a rule;

3. a standard;

4. a statement of interpretation;

5. a statement of policy.

(2)      Regulation does not include:

(i)   a statement that:

1. concerns only internal management of the unit; and

2. does not affect directly the rights of the public or the procedures available to the public.

(ii)  a response of the unit to a petition for adoption of a regulation ...; or

(iii)            a declaratory ruling of the unit as to a regulation, order, or statute ....

SG §10-101(e).

Although the Court of Appeals has eschewed any "all-encompassing statement" of the circumstances under which rulemaking is legally required, it has concluded "that when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." *CBS Inc. v. Comptroller*, 319 Md. at 694. The Court cited with approval a number of out-of-state cases holding "that legislative intent mandates use of the rulemaking process when the agency action falls within the statutory definition of ... 'regulation.'" *Id. See also, e.g., Ex parte Traylor Nursing Home, Inc.,* 543 So.2d 1179, 1183 (Ala. 1988); *Senn Park Nursing Center v. Miller*, 118 Ill. App. 3d 504, 455 N.E.2d 153, 157 (1983), *aff'd in part and rev'd in part on other grounds*, 104 Ill. 2d 169, 470 N.E.2d 1029 (1984); *Burke v. Children's Services Division*, 552 P.2d 592 (Or. App. 1976) *aff'd*, 607 P.2d 141 (1980). This office, too, "has consistently construed the definition of 'regulation' as broadly as its language and apparent underlying intent direct." 72 *Opinions of the Attorney General* 313 (1987) (Maryland Racing Commission's policy regarding Arabian racing). *See also, e.g.,* 70 *Opinions of the Attorney General* 208 (1985) (automatic waiver program as to certain tax penalties); 66 *Opinions of the Attorney General* 151 (1981) (Home Improvement Commission policy change).[6]

In determining whether agency actions meet the definition of "regulation," we have applied certain factors in considering whether the agency's action is a "prospective exercise in policy-making that will have a significant effect on members of the public." 72 *Opinions of the Attorney General* 313, 320 (1987). These factors include: (i) the fact that the action creates a significant change in a

---

[6] As one commentator has stated, a broad construction is "necessary to defeat the inclination shown by some agencies to label as 'bulletins,' 'announcements,' 'guides,' 'interpretive bulletins,' and the like, announcements which, in legal operation and effect, really amount to rules and then to assert that [they] are not technically rules but merely policy statements, and hence may be issued without observance of the procedures required in connection with the adoption of rules." 1 Cooper, *State Administrative Law* 108 (1965).

longstanding policy; (ii) the fact that the action has a widespread effect; and (iii) the fact that the action, although termed experimental, has potential for permanent change.  *Id.*

The MOU has the potential to apply to almost every student graduating from a special education program this year and in subsequent years.  It was developed in order to coordinate the programs and services being provided by the participating State agencies to students with developmental disabilities who are transitioning out of a local school system at age 21 (*i.e.,* "transitioning students") and who will likely require supported employment services in order to maintain employment during the course of their working lives.  Although its form is not one of those specifically listed in SG §10-101(e)(1)(iv), the eligibility section of the MOU has the effect of a "guideline," "standard," or "statement of policy," because it creates the standard for determining who receives these transitioning services.  To the extent that the MOU departs from current eligibility criteria reflected in regulation, moreover, it is precisely the kind of policy change that must ordinarily be accomplished through rulemaking.  *CBS v. Comptroller*, 319 Md. at 696; 65 *Opinions of the Attorney General* at 404-06.

We conclude, therefore, that the section of the MOU establishing eligibility criteria falls within the APA definition of "regulation" and is subject to the APA's rulemaking requirements unless it is expressly excluded by that same definition.

### C.    Criteria for Application of "Internal Management" Exclusion

The APA's definition of "regulation" contains three express exclusions:  statements concerning "internal management"; responses to petitions for the adoption of regulations; and declaratory rulings.  SG §10-101(e)(2).  Obviously, the MOU is neither a response to a petition for adoption of a regulation nor a declaratory ruling.  Accordingly, it is only excluded from the definition of regulation if it meets the "internal management" exception – that is, if it (1) "concerns only [the] internal management of the unit"; and (2) "does not affect directly the rights of the public or the procedures available to the public."

Whether the criterion requiring that a student "leave school with a supported job employment" is exempt from rulemaking by virtue of the internal management exception depends primarily on its effect on the public. The exception applies only if there is no significant effect either on the "procedural steps that interested persons must take in their dealings with the agency or the allocation of substantive benefits or burdens." 72 *Opinions of the Attorney General* 230, 235-36 (1987) (State's smoking policy guidelines fall within "internal management" exception).

Examples of statements that have little effect on the public include instructions merely "spell[ing] out operational details like what forms to fill out, what approvals to obtain, or what evidence to look at to determine whether an applicant meets a statutory standard." 72 *Opinions of the Attorney General* at 235. Statements that have a greater effect on the public include those that "impose application procedures, *establish eligibility criteria not set forth in a statute, restrict access to a statutory benefit,* or impose fees." *Id.* (emphasis added).

In a pertinent and instructive case, the Connecticut Supreme Court struck down that state's attempt to rely on a prior approval requirement, which had not been adopted in accordance with the Connecticut APA, to deny public assistance benefits to pay the moving expenses to an otherwise qualified applicant. *Walker v. Commissioner, Dept. of Income Maintenance*, 187 Conn. 458, 446 A.2d 822 (1982). The court held that the internal management exception did not apply to the addition of the prior approval process, because such a process "affects the substantial rights of the potential recipients." 446 A.2d at 825.

The criterion that a student must "leave school with a supported employment job" has a similarly substantial impact on eligibility for supported employment services. Given this impact, the internal management exception cannot apply; an eligibility criterion that has a substantial impact on the rights of the parties applying for supported employment may be given effect only if it is adopted through the APA rulemaking process.[7]

---

[7] Neither the referral provisions in the MOU nor its provisions relating to the agency responsibilities have so significant an impact on the

(continued...)

# V

## Conclusion

In summary, it is our opinion that the only criteria that may be applied to services funded for Transitioning Youth through the DDA are those in COMAR 10.22.18, which have been properly adopted. The criterion set forth in the MOU that requires a student to leave school with a supported employment job is not consistent with these regulations, has no legal effect, and may not be applied.

J. Joseph Curran, Jr.
*Attorney General*

Sharon Krevor-Weisbaum
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*

---

[7] (...continued)
public as to require APA rulemaking.  As we have stated before, "virtually every internal management directive will have at least some tangential effect on the public."  72 *Opinions of the Attorney General* at 235.  The key in applying this part of the exemption "is to determine ... whether [a] management directive ... has significant direct effects on the public, as distinct from the inevitable indirect ones." *Id.*  In regard to these two parts of the MOU, we do not believe that there is any significant effect on the public so as to require rulemaking.